# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 05, 2014

## STATE OF TENNESSEE v. JEFFREY HORSKINS

**Appeal from the Criminal Court for Shelby County**
**No. 1104496      W. Mark Ward, Judge**

_____

**No. W2013-00888-CCA-R3-CD  - Filed January 16, 2015**

_____

A Shelby County Grand Jury returned an indictment against Defendant, Jeffrey Horskins, charging him with attempted first degree murder, aggravated assault, two counts of aggravated burglary, and theft of property valued at more than one-thousand dollars.   After a jury trial, Defendant was found guilty of reckless endangerment, aggravated assault, two counts of aggravated burglary, and theft of property valued between $500 and $1,000. The trial court merged the two convictions for aggravated burglary and imposed a sentence of eleven months and twenty-nine days for reckless endangerment, nine years for aggravated assault, nine years for aggravated burglary, and three years for theft of property.  The trial court further found Defendant to be an offender whose record of criminal activity was extensive and ordered Defendant's sentences for aggravated assault, aggravated burglary, and theft to be served consecutively for an effective twenty-one-year sentence as a Range Two offender.  The misdemeanor sentence for reckless endangerment was ordered to be served concurrently to the other sentences.  On appeal, Defendant argues that the length of his sentences are excessive and that the trial court erred in imposing  consecutive sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

James F. Schaeffer, Jr., Memphis, Tennessee, for the appellant, Jeffrey Horskins.

Herbert H. Slatery, III, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; Doug Carriker and Charles Summers, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

The victim, Nicole Sumlin, is Defendant's ex-girlfriend, and Defendant is the father of two of her five children. Defendant and the victim had lived together but they were not living together at the time of the offenses in this case. Prior to the present offenses, the victim had sought several orders of protection against Defendant. The victim testified that on January 29, 2005, Defendant choked her and threatened to kill her while she was pregnant with their son. He also had a knife. The victim sent her oldest son to a neighbor's house to call police. Police arrived, took a report, and the victim filed for an order of protection against Defendant.

The victim again filed for an order of protection against Defendant in 2008 while the victim was pregnant with Defendant's second child. At the time, the victim was living with her mother and stepfather. Defendant had broken the windshield of her friend's car, and he called threatening the victim. The order of protection was granted for one year. After the order expired, the victim did not seek to renew it. The victim filed for another order of protection on April 28, 2010, because Defendant reached inside the driver's side window of her car, grabbed her hair, and punched her when she and her stepfather attempted to return some of Defendant's belongings to his mother's house. The victim admitted at trial that between 2008 and April of 2010, Defendant would come to her residence to babysit the children while the victim worked. The victim ceased all communication with Defendant after April 28, 2010. She still allowed Defendant to see his children through his family members. The victim testified that the order of protection sought on April 28, 2010, was not granted because she and Defendant did not appear in court due to their son being hospitalized for several weeks. The victim re-filed for the order of protection on July 20, 2010, because Defendant was stalking her and making threatening phone calls. The victim was granted an "ex parte order" until a meeting on August 18, 2010, to discuss a permanent order of protection with a commissioner.

On August 16, 2010, the victim's oldest daughter got out of school at approximately 2:15 p.m. and went home. While she waited for her mother and siblings to get home, Defendant called the house and asked for the victim's whereabouts. After the victim's daughter hung up, she saw Defendant walking around the house, twisting door knobs, and trying to get inside the house. At one point, Defendant knocked on the daughter's window. He then left. Defendant called later that night, and when the victim answered the phone, Defendant said: "I'll love you to death," and he hung up. The victim testified that she had previously seen Defendant and a friend in a red Ford Expedition backing out of her driveway.

Concerning the present offenses, the victim testified that Defendant called her at work at least fifteen times on August 17, 2010, between 6:00 a.m. and 11:00 a.m. when she left work to check her oldest daughter out of school early because her daughter was sick. The victim also noted that it was her and Defendant's son's fifth birthday. She then picked up her "baby girl" from daycare, and they arrived at the victim's cousin's house at approximately 12:30 to 12:45 p.m. to get the younger girl's hair braided. The victim and her daughters remained at the cousin's house until approximately 2:00 p.m., and they left and went to their home located on Southington Avenue. The victim asked her oldest daughter to go outside and get some laundry from a shed, and the victim watched television for approximately thirty minutes. Her three sons were still at school. The victim got up to look in the living room closet for a locking gas cap for her mother's car. The victim stated that she had been driving her mother's car because her own car had been vandalized by someone who put sugar in the gas tank.

As the victim was looking for the gas cap, she noticed that all of the clothing and coats had been pulled down in the closet. She began shifting through the garments and found Defendant hiding in the closet wearing latex gloves and holding a large knife from the kitchen. The victim then ran out of the house screaming for help and for her daughter to call 911. As the victim made it to her front yard, Defendant grabbed her from behind with his left hand and "plunged" the knife into her chest with his right hand. The victim's children and her neighbor, Lasonya Thomas, were standing outside at the time. The victim grabbed the blade of the knife and "was able to wiggle it loose." Defendant continued to chase the victim, and the victim grabbed the knife again and broke the blade. The victim ran across the street to Mrs. Thomas' yard, and Defendant continued to pursue her. The victim testified that Mrs. Thomas attempted to get between the victim and Defendant. The victim "just swung the blade and it cut [Defendant's] arm." The victim then went inside Mrs. Thomas' house, and Mrs. Thomas called 911. Defendant went back to the victim's house.

When Defendant arrived back at the victim's house, her daughter was inside with the door locked attempting to call 911. Just as the 911 operator answered, Defendant kicked in the front door and demanded to know "where the keys was." As Defendant searched the house for the keys, the victim's daughter ran outside and across the street to the victim. Defendant later emerged with the victim's keys and wallet, and he left in the victim's mother's car. Emergency personnel arrived, and the victim was taken to the hospital by ambulance. The victim's wounds were treated, and she was released from the hospital that same day.

Defendant called the victim's cell phone at approximately 9:00 p.m. on August 17, 2010. Because the victim did not recognized the number, she answered the phone, and Defendant hung up. The victim used an application on her cell phone called "Privacy Star"

to trace the phone number. When Defendant called a second time, the victim answered and told Defendant that she knew it was him calling. The victim gave her stepfather the address that pulled up with the phone number, and he drove to a hotel and located Defendant. Police also arrived at the hotel and eventually took Defendant into custody after he attempted to run away from them. Defendant had an injury to his arm.

Defendant testified that after the victim filed for the last order of protection against him, she would call and ask him to come over to her house on Southington Avenue to babysit and help the children get ready for school in the mornings while the victim worked. Defendant denied being at the victim's house on August 16, 2010, because he was at 4891 Haleville Road sick that day. Defendant claimed that the victim, her oldest daughter, and Defendant's daughter picked him up at the Haleville address on August 17, 2010, for his son's fifth birthday party, which he thought was being held at a skating rink. Defendant said that he was not supposed to go to the victim's house but the victim drove him there. He claimed that he initially remained in the car while the victim and her oldest daughter went inside.

Defendant testified that he eventually walked inside the house because the victim asked him to come inside. He said that he sat on the couch and did not get inside the closet at any time. Defendant testified that he was not wearing latex gloves, and he did not get a knife out of the kitchen. He said that he remained on the couch for approximately one hour before the victim walked in the room with a knife and "swung" it at him cutting his arm. Defendant opined that the victim was upset with him for calling the police on her two weeks earlier for leaving her children alone. He said that he ran out the door, and the victim ran out behind him still wielding the knife. Defendant testified that he and the victim began struggling over the knife, and she eventually was stabbed. He said that he got away from the victim, and she ran away to Mrs. Thomas' house. Defendant did not know how the knife got broken. He said that the victim never grabbed the knife's blade, and he never put his arms around the victim. Defendant claimed that he told Mrs. Thomas that the victim cut him, and he asked her to call police because he thought that he was going to faint. Defendant testified that he then walked back to the victim's house, got her keys that were still in the back door, and left in the car. He denied kicking in the front door of the house. Defendant testified that he left the victim's mother's car approximately three blocks from the victim's house, and his brother picked him up. That evening he went to the Sun Inn, and was later taken into custody by police. He denied attempting to run away from the officers.

-4-

## II. Analysis

Defendant contends that the trial court erred in sentencing him. More specifically, he states that his sentence is excessive and that the trial court erred by imposing consecutive sentencing.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

We note that even a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. Here, as enhancement factors, the trial court found that Defendant had a history of criminal convictions in addition to those necessary to establish the appropriate range; the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114(1), (8) & (9). The record reflects that these factors were appropriately applied. The trial court noted that Defendant had violated his probation in a previous case, and the court placed great weight on the fact that Defendant had eleven prior misdemeanor convictions, which included assault, misdemeanor stalking, and domestic violence. He also had three prior felony convictions, two of which would be used to classify him as a Range Two offender, that included two aggravated assaults and one felony stalking conviction. The trial court properly sentenced Defendant within the applicable range of punishment for each offense. Therefore, this issue is without merit.

Defendant argues that the trial court improperly imposed consecutive sentencing. Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations . . . if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard,* 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); *see also Bise*, 380 S.W.3d 705.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1)     The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual

activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. In this case, the trial court made the following findings concerning consecutive sentencing:

As far as the issue of consecutive sentencing I do find that the defendant is a person, who is an offender of whose record of criminal activity is extensive. In making that determination I consider not only his three prior felonies, but the three felonies that he stands convicted for, before me and the eleven misdemeanors.

The most atrociously [sic], I find the prior felony stalking, domestic violence, misdemeanor stalking and assaults caused me trouble.

So I do feel like consecutive sentencing is warranted. I am going to order the misdemeanor, reckless endangerment, to be served concurrent to all other counts. But, the nine years and the three years, I am going to make consecutive of each other, for a total of twenty-one years as a range two offender.

The records supports the trial court's finding due to Defendant's extensive history of criminal activity. We conclude that the sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Defendant is not entitled to relief.

Accordingly, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

-7-